OPINION
Defendant appellant Kathy Ann Holt appeals her conviction and sentence from the Fairfield County Court of Common Pleas on one count of complicity to commit aggravated robbery in violation of R.C. 2923.03. Plaintiff appellee is the State of Ohio. STATEMENT OF THE FACTS AND CASE On June 26, 1998, the Fairfield County Grand Jury indicted appellant on one count of complicity to commit aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1) and R.C. 2923.03. The indictment also contained a repeat offender specification pursuant to R.C. 2941.149 stating that appellant "is a repeat offender, having previously been convicted of Attempted Murder, a felony of the first degree, on July 8, 1981, in Franklin County Common Pleas Court, Case No. 80CR-10-3221 and Aggravated Burglary, a felony of the first degree, on December 7, 1981, Franklin County Common Pleas Court, Case No. 81CR-05-1478." At her arraignment on July 29, 1998, appellant entered a not guilty plea. On September 8, 1998, appellant filed a written waiver of her constitutional and statutory speedy trial rights. Thereafter, a jury trial was scheduled for October 21, 1998. Appellant, on October 20, 1998, filed a written waiver of her right to a jury trial. The next day, a bench trial commenced before Judge James Luse. The following evidence was adduced at trial. On February 8, 1998, at approximately 8:45 P.M., a Dairy Mart on North Columbus Street in Lancaster, Ohio, was robbed. Stephanie Bailey, who was working at Dairy Mart that night, testified that a man who had a pillowcase over his head and was wearing a white shirt, blue jeans and white shoes came into the store and said "This is a robbery. I'm not joking. Don't push no buttons. Don't make no phone calls." Transcript of Proceedings at 176. Bailey testified that from the man's voice, "you could tell he was a young child." Transcript of Proceedings at 177. After the man put the tip of a knife to her back, Bailey went over to the cash register and opened the register's drawer. The man then "grabbed what he wanted and he jumped my counter and he was gone." Transcript of Proceedings at 176. Approximately $96.00 was taken. Since the man had a pillowcase over his head, appellant was unable to identify him. Shortly after 9:00 P.M. in response to a call from Bailey, the police arrived at the Dairy Mart. Detective Rod Sandy of the City of Lancaster Police Department testified that, inside the store, the police found a dusty shoe print on top of a glass counter. A pair of red and white Nike high-top tennis shoes were recovered in an alley two blocks behind Dairy Mart. In addition, a multi-colored pillowcase with two holes cut out for the eyes and one for the mouth was located near the Dairy Mart. At trial, Bailey identified the pillow case as the one used during the robbery and identified a knife marked as State's Exhibit 6 as either the knife used during the robbery or one extremely similar to the same. Detective Sandy further testified that on February 20, 1998, he was notified that a woman named Barbara Rathburn was at the Dairy Mart. Detective Sandy stated he "was attempting to contact this lady I only knew initially as Barb, because Dairy Mart had called on a couple of occasions saying that this woman had come into the store and said that she knew who had done the robbery and that she wanted $1,000.00 for the information before she would come to the police." Transcript of Proceedings at 46. When Sandy arrived at the Dairy Mart, Rathburn was gone. Detective Sandy discovered that Rathburn was living with appellant. On February 20, 1998, Detective Sandy interviewed appellant about the Dairy Mart robbery. Appellant had worked at the North Columbus Street Dairy Mart for three days in October of 1997 before quitting without giving any reason why. Appellant's interview with Detective Sandy, which was tape recorded, was played during the bench trial. During her interview, appellant stated that on February 8, 1998, the day that Dairy Mart was robbed, appellant's daughter Brandy and Brandy's boyfriend, Clarence Tope, were over at appellant's house. According to appellant, Tope, who had a crack cocaine problem, "kept saying he was going to rob somebody." Transcript of Proceedings at 70. While at appellant's house, Tope had "put on some sheets and stuff that day and said he was going to take a knife or anything that he could. He was going to do what he had to do. He was on crack." Transcript of Proceedings at 71. Tope also was playing with knives. Appellant told Detective Sandy that Tope, who had earlier that day told appellant that the Dairy Mart looked like a good place to rob, asked appellant to drop him off at the Dairy Mart on Columbus Street. Appellant knew that Tope had been told by a third party that Dairy Mart did not have security cameras. When appellant pulled up to the Dairy Mart in the dark, Tope got out of appellant's car. Appellant testified that she then drove home and that "[s]econds later, Duke [Tope] come running in my house and said that he pulled a knife on a lady and robbed her . . ." Transcript of Proceedings at 72. Tope had money and food stamps on him. When she was asked by Detective Sandy why she believed that Tope wanted to be dropped off behind Dairy Mart, appellant testified as follows: "At the time — [w]ell, maybe because he wanted to do something wrong". Transcript of Proceedings at 75. Appellant further told Sandy that Tope "kept saying he wanted to rob somebody," but that she did not believe Tope would rob anyone since he was a "bull-shitter" who "talks a lot of shit." Transcript of Proceedings at 96-97. Id. Appellant further claimed that she did not see Tope leaving the house with a pillowcase or knife. Not only was the tape recording of appellant's interview with Detective Sandy played at trial, but appellant herself testified. Appellant, who has served at least 12 years in prison for aggravated burglary and attempted murder, testified in person that Tope and Brandy, appellant's daughter, were fighting on the day of the robbery. According to appellant, she dropped Tope off in an alley in back of the Dairy Mart to be rid of him. Appellant, admitted that Tope had been talking about robbing someone to get money for crack cocaine and that she had seen Tope cut holes in the pillowcase, but denied waiting for Tope after the robbery or encouraging him to commit the same. Clarence Tope, who had pleaded guilty to committing the Dairy Mart robbery, also testified at the bench trial. While appellant claimed that she had just met Tope, Tope, who testified that he did not receive any deal from the prosecution in exchange for his testimony, testified that he had known appellant "all of my life. I haven't really talked to her that much, just off and on for the past few months." Transcript of Proceedings at 197. While Tope admitted robbing the Dairy Mart, with a knife for drug money, he testified that it was appellant's idea and that appellant had pressured him into committing the robbery. According to Tope, appellant told him that the Dairy Mart did not have any cameras or alarm and that, after making sure that there was no one in the store, he should "[j]ust . . . run in the store and then run right back out and get in a car." Transcript of Proceedings at 200. Tope, who identified the pillowcase at trial, further testified that appellant drove him to Dairy Mart, and that when he got out of the car, appellant knew he was going to rob Dairy Mart. According to Tope, he used a knife from appellant's home to commit the robbery. The knife was later found laying beside a bed in appellant's house. Tope further testified that appellant picked him up after the robbery and told him to "throw everything out the window that I had on." Transcript of Proceedings at 208. Tope, who identified the tennis shoes found by the police, denied concealing the knife used in the robbery but rather testified that the knife was beside him on the seat in appellant's car. While Tope kept the money from the robbery, he testified that appellant got the food stamps. Although Tope testified that appellant then drove him to Columbus that night to buy crack cocaine, appellant denied doing so. On February 9, 1999, appellant drove Tope back to Columbus. After the conclusion of the testimony, the trial court found appellant guilty of complicity to commit aggravated robbery, a felony of the first degree. The trial court further found that appellant was a repeat violent offender. On October 30, 1998, appellant was sentenced to six years in prison on the charge of complicity to commit aggravated robbery and an additional two years on the repeat violent offender specification. The two sentences were to be served consecutively, for an aggregate sentence of eight years in prison. The same day, a "temporary commitment" signed by Judge James W. Luse was filed indicating that appellant was sentenced to eight years in prison and that appellant was to report to the Fairfield County Jail to begin sentence on October 30, 1998, at 2:15 P.M. The "Temporary Commitment," which was directed to the sheriff of Fairfield County, further stated as follows: "This order is your authority to accept and confine said defendant until a commitment is received by you from the clerk of this Court, or the defendant is otherwise discharged by order of the Court."
No other entry was filed at such time. After the trial court realized that the sentence it imposed on appellant was invalid under R.C. 2929.14(D)(2)(b) since the court could not impose a sentence on a repeat violent offender specification unless the court sentenced appellant to the maximum sentence on the principal charge, which it did not do, a re-sentencing hearing was held on November 6, 1998. Pursuant to a Judgment Entry of Sentence filed on November 13, 1998, the trial court, stating that it "represented to all parties that it was the court's intention to imposed [sic] an eight year term of incarceration upon the Defendant," sentenced appellant to an eight year prison sentence on the charge of complicity to commit aggravated robbery. The trial court, however, did not impose any sentence on appellant with respect to the repeat violent offender specification. It is from her conviction and sentence that appellant prosecutes her appeal, raising the following assignments of error:
ASSIGNMENT OF ERROR I
THE TRIAL COURT'S IMPOSITION OF A MORE SEVERE SENTENCE AFTER EXECUTION OF DEFENDANT/APPELLANT'S ORIGINAL SENTENCE VIOLATED THE DOUBLE JEOPARDY CLAUSE OF THE OHIO AND UNITED STATES CONSTITUTIONS.
ASSIGNMENT OF ERROR II
 THE STATE PRESENTED INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION OF COMPLICITY
 I
Appellant, in her first assignment of error, maintains that the trial court's re-sentencing of appellant violated the double jeopardy clause of the Ohio and United States Constitutions. We disagree. Appellant was originally sentenced to six years in prison on the complicity to commit aggravated robbery charge. At the November 6, 1998 re-sentencing hearing, her sentence for such offense was increased to eight years. According to appellant, "the six month [sic] sentence was properly pronounced first and set into execution by the October 30, 1998, entry . . . and, when pronounced, and so executed, the trial court lost jurisdiction over appellant for sentencing purposes." A trial court is prohibited by double jeopardy restrictions from modifying a completed sentence by increasing it after execution of the sentence has commenced. City of Columbus v. Messer (1982),7 Ohio App.3d 266, 268, citing United States v. Benz (1931),282 U.S. 304, and Ex parte Lange (1873), 85 U.S. 163. "Where the full sentence involves imprisonment, the execution of the sentence is commenced when the defendant is delivered from the temporary detention facility of the judicial branch to the penal institution of the executive branch." (Emphasis added). Id. at 268. See also State v. Parsons (1997), 122 Ohio App.3d 284. Thus, the issue for determination in this case is whether execution of appellant's sentence had commenced before appellant was re-sentenced on November 6, 1998. Appellant, in the case sub judice, was originally sentenced on October 30, 1998, to six years in prison on the count of complicity to commit aggravated robbery and two years in prison on the repeat violent offender specification. The two sentences were to be served consecutively for an aggregate sentence of eight years. After the October 30, 1998, sentencing hearing, the trial court signed a "temporary commitment order" stating that appellant had been sentenced to eight years in a penal institution and directing the Sheriff of Fairfield County "to accept and confine said defendant until a commitment is received by you from the Clerk of this Court, . . ." However, no sentencing entry was filed by the trial court after the October 30, 1998, hearing but before the re-sentencing hearing in November. Nor was a warrant to convey appellant to any penal institution filed with the Clerk of Courts during such time. At the re-sentencing hearing on November 6, 1998, the trial court sentenced appellant to eight years on the complicity to commit aggravated robbery charge but did not impose any sentence on the repeat violent offender specification. In re-sentencing appellant, the trial court stated as follows: "There was a sentencing held on this matter and at that time, the Court imposed a sentence of six years on the complicity to commit aggravated robbery and then indicated a two-year sentence on the repeat violent offender, with the sentence to run consecutive, which would be an eight-year sentence. It's come to the Court's attention that this sentence was not appropriate under the provisions of the Ohio Revised Code concerning sentencing on the specification, that is, a repeat violent offender, unless the Court has imposed the maximum sentence as a penalty for the underlying offense. Since this was a first-degree felony, the maximum penalty would be ten years. And since the Court did not impose that, the Court could not impose a sentence on the repeat violent offender. It was the Court's intention — I think everyone understood that at the time — that the sentence would be eight years. So to correct the record, what the Court is going to do is impose a sentence of eight years on the underlying offense, the complicity to commit aggravated robbery. And since the Court has not imposed the maximum sentence, the Court would not impose any sentence on the specification of a repeat violent offender." Transcript of Proceedings at 17-18.
Thereafter, a Judgment Entry of sentencing was filed on November 13, 1998. Three days later, a "Warrant to Convey" was issued by the Clerk of Courts directing the Sheriff to convey appellant to the Ohio Reformatory for Women in Marysville, Ohio. Appellant was conveyed to the prison in Marysville on the same day. The "Warrant to Convey" along with the Sheriff's Return was filed on November 17, 1998. Based on the above facts, it is clear to this court that execution of appellant's sentence did not begin until November 16, 1998, when appellant was transferred to prison in Marysville. It is not until such time that appellant was "delivered from the temporary detention facility of the judicial branch (i.e. the Fairfield County Jail) to the penal institution of the executive branch". See State v. Kaplan (December 15, 1998), Belmont App. No. 97BA43, unreported. Since appellant's sentence had not commenced at the time of the re-sentencing on November 6, 1998, the trial court's re-sentencing of appellant and imposition of a more severe sentence for the charge of complicity to commit aggravated robbery did not violate the double jeopardy clause of the Ohio and United States Constitutions. Moreover, a trial court may correct a legally improper sentence, even if, upon resentencing, a greater penalty is imposed. State v. Sawicki (1998), 128 Ohio App.3d 585,587. The trial court in this matter did not originally impose a lawful sentence on appellant since the sentence it imposed on appellant was invalid under R.C. 2929.14(D)(2)(b). The trial court could not impose a sentence on a repeat violent offender specification unless the court sentenced appellant to the maximum sentence on the principal charge, which it did not do. The trial court, therefore, did not violate the double jeopardy clause by resentencing appellant. Appellant's first assignment of error is overruled.
 II
In her second assignment of error, appellant argues that her conviction for complicity to commit aggravated robbery is against the sufficiency of the evidence. We disagree. Appellant specifically contends that "the evidence, absent the robber's self-serving testimony, does not exclude the reasonable hypothesis that appellant is being truthful when she says that she did not believe [Tope] would really commit any robbery." In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Jenks, supra at paragraph two of the syllabus.
When applying the aforementioned standard of review to the case sub judice, based upon the facts noted supra, we do not find, as a matter of law, appellant's conviction was based upon insufficient evidence. Tope, who did not receive any deal for testifying, testified that appellant pressured him into robbing the Dairy Mart, drove him to the Dairy Mart, and then picked him up after the robbery. Tope had never been in Lancaster before. Appellant maintains that she was not aware that Tope, who appellant knew was a crack addict, intended to rob the Dairy Mart. However, by appellant's own admission, appellant heard Tope state several times that he wanted to rob someone or something to get money for crack, saw Tope playing with knives and putting pillowcases and sheets over his head, and observed Tope cutting holes in the pillowcases. In addition, as evidenced by her own testimony, appellant heard Tope say earlier on the same day of the robbery that the Dairy Mart looked like a good place to rob. Appellant, who knew that Tope was aware that the Dairy Mart did not have a security system, drove appellant to the Dairy Mart where she dropped him off in an alley behind the store at approximately 9:00 P.M. When asked by Detective Sandy why she believed Tope wanted to be dropped off at the Dairy Mart, appellant responded as follows: "[w]ell, maybe because he wanted to do something wrong." Transcript of Proceedings at 75. Appellant, when asked by Detective Sandy "What something wrong?", told Detective Sandy that Tope kept saying he wanted to rob somebody." Id. The appellant denied picking up Tope after the robbery, but, as the trial court noted, appellant's claim that Tope walked back to appellant's house after the robbery, shoeless in February, during the middle of the night and in an unfamiliar town was not credible. Moreover, Tope's testimony that appellant told him to throw his shoes and the pillowcase used in the robbery out of the car window was supported by the physical evidence since both the shoes and the pillowcase were located in alleys near the Dairy Mart. As the trial court stated at the conclusion of the bench trial, "[i]t just isn't reasonable that he's going to try to do this on his own in a strange community, in a strange place, a store he doesn't know about, without somebody helping him" Transcript of Proceedings at 420. Thus, there was sufficient credible evidence supporting appellant's conviction for complicity to commit aggravated robbery.
Appellant's second assignment of error is overruled.
The Judgment of the Fairfield County Court of Common Pleas is affirmed.
By Edwards, J. Wise, P.J. and Farmer, J. concur